## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| THERESA SMART o/b/o K.A.R., | CASE NO. 1:21-CV-00099-CEF |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Theresa Smart filed a Complaint against the Commissioner of Social Security (Commissioner) on behalf of minor Plaintiff K.A.R., seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI). (ECF #1). This Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 14, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

### PROCEDURAL BACKGROUND

Ms. Smart filed for SSI on behalf of K.A.R. on June 16, 2017, alleging a disability onset date of January 1, 2010. (Tr. 75-76). The claim was denied initially and on reconsideration. (Tr. 75-

89, 91-105). Ms. Smart then requested a hearing before an administrative law judge. (Tr. 122-23). On February 10, 2020, K.A.R. and Ms. Smart (represented by counsel) appeared and testified at a hearing before the ALJ. (Tr. 36-73). On March 11, 2020, the ALJ found K.A.R. not disabled in a written decision. (Tr. 12-30). The Appeals Council denied Ms. Smart's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; 20 C.F.R. §§ 416.1455, 416.1481). Ms. Smart timely filed this action on behalf of K.A.R. on January 14, 2021. (ECF #1).

FACTUAL BACKGROUND[1]

I. ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Smart and K.A.R. presented during the hearing before the ALJ.

K.A.R. testified she is in fifth grade. (Tr. 41). She likes to do crafts and play computer games. (Tr. 42-43). K.A.R. enjoys art and gets As and Bs in her classes. (Tr. 42). K.A.R. appears to be immunocompromised; she often gets sick and misses school. (Tr. 52, 64). She had missed 14 days of school as of the administrative hearing; she had missed more than that in previous school years. (Tr. 64). Ms. Smart estimated that K.A.R. visits the doctor once or twice a month for infections and sickness—illnesses that the rest of the family does not contract. (*Id.*). K.A.R. was previously hospitalized for sepsis after contracting a common cold. (Tr. 67).

K.A.R. testified she does not like her gym class because it hurts to run. (Tr. 43-44). K.A.R. and her classmates are required to run for five minutes in gym class. (Tr. 44). K.A.R. testified she

---

[1]  Ms. Smart alleges the ALJ's decision as to Listings 101.02, 114.09, 108.00, 112.04, and 112.06 was not supported by substantial evidence. (Pl.'s Br., ECF #10, PageID 1730-40). Accordingly, she waives argument on any other issues not raised in the opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). I therefore summarize here only the evidence relevant to the claims Ms. Smart has actually advanced.

can only run for two or three minutes compared to her peers; after she is finished running, her knees feel like they are burning. (Tr. 44-45). K.A.R. "wait[s] it off": it takes some time for the burning to stop. (Tr. 45). K.A.R. has difficulty walking up stairs and places both feet on each step before climbing to the next. (Tr. 50-51). The back of her legs become numb after walking up the stairs. (Tr. 51).

K.A.R. has trouble using her hands and her fingers to write. (Tr. 45). She must use special scissors. (Tr. 46). Even when using the special scissors, her fingers get numb and stiff after three to four minutes. (Tr. 46-47).

K.A.R. also experiences stomach problems, which she describes as painful, like her stomach is "twisted." (Tr. 47-48). She visits the school nurse when her stomach is upset and painful. (*Id.*). K.A.R. does not throw up during these episodes. (Tr. 48). K.A.R. takes a stomach medication, hostacycline, which relieves the pain a majority of the time. (Tr. 69).

K.A.R.'s mother, Ms. Smart, testified. Ms. Smart described the varying diagnoses K.A.R. has received: idiopathic juvenile arthritis, lupus, periodic fever syndrome, and stomach issues. (Tr. 53). K.A.R.'s doctors have also considered Crohn's disease and fibromyalgia as possible diagnoses. (Tr. 71). K.A.R. was originally treated for arthritis, lupus, and stomach issues by a previous doctor. (Tr. 53). K.A.R.'s current doctor diagnosed her with hypermobility arthralgia,[2] GI issues, urticaria vasculitis,[3] a pulmonary issue, and a skin condition. (Tr. 54). In addition to these ailments, K.A.R.

---

[2]    Hypermobility arthralgia is a connective tissue disorder causing flexible joints and loose, weak ligaments. *See Nationwide Children's Hospital, Hypermobility Syndrome*, http://www.nationwidechildrens.orgurtica/conditions/hypermobile-joints (last visited April 13, 2022). This condition can cause pain, frequent joint and ligament injuries, and early-onset arthritis. *Id.*

[3]    Urticarial vasculitis is a rare autoimmune disorder characterized by the inflammation of blood vessels affecting primarily the small vessels of the skin. *Vasculitis Foundation*,

3

was diagnosed with anxiety and depression, and has an IEP for all subjects, due in part to her health complications. (Tr. 54). In Ms. Smart's opinion, K.A.R. is behind compared to other children. (Tr. 55). It can take up to an hour to get K.A.R. moving in the morning and ready for school; due to her pain and stiffness, K.A.R. has a doctor's note allowing her to be tardy for school. (*Id.*).

K.A.R. does not have problems with personal hygiene or caring for herself, but she does need help tying her shoes because her joint stiffness does not allow her to tie her shoes tight enough. (Tr. 55-56). K.A.R. has problems with walking, balance, standing, and sitting. (Tr. 68). K.A.R. has difficulty playing. (Tr. 56). K.A.R. can only do physical activities such as riding a bike for about five minutes before she stops and complains that her legs throb and swell. (*Id.*). She can only go outside to walk around the family's property for ten minutes before she needs to sit down due to pain. (*Id.*). K.A.R. has a physical therapist she sees for her hypermobility syndrome but still has problems with buckling knees and balance when climbing stairs. (Tr. 57).

Included in K.A.R.'s IEP for middle school is an additional five to seven minutes' grace period and someone to help her climb stairs when switching classes. (*Id.*). K.A.R. also has accommodations in her IEP for special scissors (described as similar to garden shears), thicker pencils, pencil grips, and specially lined paper. (Tr. 58). Due to pain, K.A.R. finds it difficult to write more than one or two sentences. (*Id.*). For longer paragraphs, K.A.R. has speak-to-text accommodations in her IEP. (*Id.*). K.A.R. failed her third and fourth grade state tests because she was physically unable to write more than one or two sentences at a time. (*Id.*). K.A.R. now has

---

*Urticarial Vasculitis*, http://www.vasculitisfoundation.org/education/forms/urticarial-vasculitis/ (last visited April 13, 2022). It causes hives and itchy red patches on the skin, and may affect other organ systems. *Id.* Severe cases may be treated with corticosteroids or immunosuppressants. *Id.*

speak-to-text accommodations for her state testing requirements. (*Id.*). K.A.R. also has an accommodation for speech and occupational therapy on her IEP, but does not currently access these services. (Tr. 59).

K.A.R. has difficulty making friends at school, but gets along with her teachers and family. (Tr. 59-60). She can listen to rules and follow directions when prompted. (Tr. 60). K.A.R. previously was in a peer group of disabled and non-disabled children to teach her how to make friends, which helped. (Tr. 59). Due to her anxiety and depression, K.A.R. finds it hard to associate with other children; she tends to keep to herself because she is afraid of what other people think of her and her disabilities. (*Id.*).

K.A.R. has difficulty focusing, depending on her pain level. (Tr. 61). She cannot always recall what she has seen after watching a television program. (*Id.*). She sometimes cannot recall what she has read after finishing a chapter in a book, or when asked questions with her homework. (*Id.*).

K.A.R. was on methotrexate[4] for urticarial vasculitis for over three years. (Tr. 65-66). After this period, she was unable to receive methotrexate because it aggravated her veins; methotrexate was replaced with steroid injections. (Tr. 65). K.A.R.'s condition is being monitored by her allergist and rheumatologist; she will be re-started on these medications if the urticarial vasculitis and arthritis becomes uncontrolled with allergy medications. (Tr. 65-66). K.A.R. still experiences urticarial vasculitis episodes. (Tr. 66).

---

[4]  Methotrexate is an immunosuppressant used to treat conditions such as severe psoriasis and rheumatoid arthritis that cannot be controlled through other treatments. *Medline Plus, Methotrexate, National Library of Medicine*, http://medlineplus.gov/druginfo/meds/a682019.html (last accessed April 13, 2022).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

K.A.R. was born on August 13, 2008, and was sixteen months old at her alleged onset date. (Tr. 75). K.A.R. was nine years old on the date her application was filed, and was twelve years old by the date of the administrative hearing. (Tr. 16, 75; *see* Tr. 38). K.A.R. was a school-aged child at all times during the application and review process. (Tr. 16; *see also* 20 C.F.R. 416.926a(g)(2)).

## III.  RELEVANT MEDICAL EVIDENCE

**Nationwide Children's Hospital.** On June 8, 2016, K.A.R. (then 7 years old) was seen by Ross Maltz, M.D., for abdominal pain. (Tr. 597, 604). Dr. Maltz noted K.A.R. was diagnosed with generalized abdominal pain, chronic urticaria, psoriasis, and arthritis. (*Id.*). Dr. Maltz indicated K.A.R.'s urticaria have resolved on methotrexate. (Tr. 597, 601). Dr. Maltz's notes also indicate a prior history of pneumonia and sepsis. (Tr. 599, 602). Dr. Maltz ordered blood work to screen for celiac disease, as K.A.R. could be at an increased risk due to her other autoimmune diagnoses. (Tr. 604). Dr. Maltz started K.A.R. on high dose folic acid to counter the side effect of nausea while on methotrexate. (*Id.*). Charles Spencer, M.D., K.A.R.'s rheumatologist, indicated K.A.R. was "doing decently" and ready to lower her methotrexate dose "and see how she does." (Tr. 616).

At follow up on August 16, 2016, K.A.R.'s methotrexate dose was increased after she continued to have arthritis flares while on the lower dose. (Tr. 617). K.A.R.'s blood test results were negative for celiac disease. (*Id.*). K.A.R. continued to complain of daily abdominal pain, without nausea, vomiting, or diarrhea, worse in the morning and before bed. (*Id.*). K.A.R. experienced knee and ankle swelling and pain, achiness in her fingers, and trouble writing in school; she had 20 minutes of stiffness every morning. (Tr. 618). Dr. Spencer reduced K.A.R.'s

methotrexate dose, stopped K.A.R.'s diclofenac medication but continued her on Mobic (for her arthritis). (Tr. 620).

On September 2, 2016, K.A.R. underwent a colonoscopy and an esophagogastroduodenoscopy. (Tr. 636).

On November 3, 2016, K.A.R. was referred to Rose Schroedl, Ph.D. at Nationwide Children's Hospital for treatment of abdominal pain amplified by stress. (Tr. 371). Dr. Schroedl noted K.A.R.'s history of asthma, psoriasis, periumbilical abdominal pain, and juvenile arthritis. (*Id.*). K.A.R. presented with anxiety, somatic complaints, and pain. (*Id.*). K.A.R. had an unkempt appearance, was shy and withdrawn, anxious, and had a flat affect. (Tr. 374). K.A.R. reported pain daily, including on weekends, although her pain was reportedly worse on weekday mornings and during stressful events at school. (Tr. 371). At school, K.A.R. becomes tearful and asks to leave the classroom; at home, her parents give her medicine and allow her to rest. (*Id.*). Dr. Schroedl assessed K.A.R., describing her anxiety, history, and current environmental stressors as impacting her social and emotional functioning at home and school, resulting in avoidance, withdrawal, and increased pain. (Tr. 374). Dr. Schroedl recommended outpatient therapy for anxiety and pain management, in coordination with K.A.R.'s school counselor. (*Id.*).

On November 22, 2016, Dr. Spencer noted K.A.R. had not experienced urticaria despite the decreased methotrexate dosage. (Tr. 656). Her chronic urticaria and arthritis were improving gradually, and Dr. Spencer continued to lower the methotrexate dosage slowly. (Tr. 658). However, K.A.R. was "doing badly with pain at times" and "coughing in bad spells—even vomiting." (Tr. 656). Dr. Spencer prescribed an albuterol inhaler. (Tr. 658).

On February 28, 2017, K.A.R. was hospitalized, presenting with tachycardia, elevated blood pressure, fever, malaise, myalgias, rash, headache, and sore throat. (Tr. 667-68, 675). She was positive for pneumonia. (*Id.*). K.A.R. responded to antibiotics and was discharged on March 2, 2017. (Tr. 672, 676).

On May 10, 2017, Stacy Ardoin, M.D., indicated K.A.R.'s systemic arthritis was well-controlled on the current therapy. (Tr. 693). Dr. Ardoin continued K.A.R. on the lower dose of methotrexate, meloxicam, and folic acid. (*Id.*). Dr. Ardoin noted insurance challenges in obtaining K.A.R.'s Prevacid prescription; Ms. Smart was purchasing over-the-counter Prevacid, but it only "help[ed] some" and was quite expensive. (Tr. 692). K.A.R.'s abdominal pain and nausea were worse without Prevacid. (*Id.*). Dr. Ardoin noted K.A.R.'s reports of stiffness in her knees and left wrist, but her activities were not limited by her joint symptoms. (*Id.*).

K.A.R.'s urticaria was quiet on methotrexate at a follow up with Dr. Spencer on October 18, 2017. (Tr. 718). Dr. Spencer lowered K.A.R.'s methotrexate dosage, but kept her on antihistamines, GI meds, and folic acid. (Tr. 718).

K.A.R. visited Dr. Ardoin on February 16, 2018. (Tr. 745-46). In Dr. Ardoin's assessment, K.A.R.'s intermittent musculoskeletal pain was mechanical in nature. (Tr. 746, 752). Dr. Ardoin suggested increasing K.A.R.'s NSAID dose and physical therapy, and considered tapering the methotrexate dose in the future if she continues to do well. (*Id.*). K.A.R. receives intermittent occupational therapy in school, but was not receiving physical therapy. (Tr. 747). Ms. Smart reported K.A.R. improved significantly with methotrexate and previous attempts to wean K.A.R. off of methotrexate had resulted in flares of skin disease. (*Id.*). Dr. Ardoin noted K.A.R. had hypermobility in her patella and slight valgus (knock-kneed) positioning of her legs which might

contribute to K.A.R.'s lower extremity pain; Dr. Ardoin recommended increasing her Mobic dose to help with these symptoms, and referred K.A.R. for physical therapy. (Tr. 751).

On June 11, 2018, K.A.R. transferred her GI care from Dr. Maltz to Jonathan Gisser, M.D., at the Nationwide Children's Hospital Mansfield location. (Tr. 1267). Dr. Gisser indicated K.A.R. had been diagnosed with functional abdominal pain after a normal upper endoscopy and colonoscopy; he agreed with this diagnosis. (*Id.*). Dr. Gisser started K.A.R. on an antispasmodic, hyoscyamine, and stopped her Elavil prescription. (*Id.*). Dr. Gisser indicated there may be a correlation between K.A.R.'s increased BMI and her functional abdominal pain, but did not suggest intervention was necessary at that time. (*Id.*).

On August 1, 2018, K.A.R. was seen by Cagri Toruner, M.D., and Laura Ballenger, M.D., in rheumatology. (Tr. 1285, 1309). Dr. Ballenger found no signs of arthritis, urticaria, or vasculitis on exam. (Tr. 1309). Dr. Ballenger recommended weaning K.A.R. from methotrexate, as she had only one recent episode of urticaria. (*Id.*). Dr. Ballenger ordered blood work, urine sample, and a chest X-ray; continued with the current dose of methotrexate (to discuss weaning in the fall); and recommended discussing K.A.R.'s sleep with her pediatrician. (Tr. 1310). Dr. Ballenger ordered a screen for histoplasmosis infection after a lingering cough from her April 2018 bout of pneumonia—histoplasmosis infection can cause chronic pulmonary symptoms in an immunosuppressed patient. (*Id.*). The histoplasmosis screen was negative, there were no signs of methotrexate toxicity, and no concerns on the chest X-ray. (Tr. 1311).

Dr. Toruner agreed with Dr. Ballenger's assessment. (Tr. 1285).

On November 16, 2018, Dr. Ballenger's notes indicate K.A.R. (now 10 years old) had no breakthrough rash despite not being able to take methotrexate and stopped methotrexate and folic

acid. (Tr. 1321). Dr. Ballenger noted K.A.R. had missed many doses of methotrexate over the past six months for frequent viral symptoms. (Tr. 1322). K.A.R. had continued joint pain (rated at a six out of ten during the past week), but Dr. Ballenger found no evidence of arthritis on exam and instead found K.A.R. exhibited joint hypermobility features. (Tr. 1325, 1333). In Dr. Ballenger's opinion, the pain was likely mechanical, related to the hypermobility; she referred K.A.R. to physical therapy and recommended shoe inserts to help with the positioning of her flat feet. (*Id.*). Fatima Barbar-Smiley, M.D., agreed with Dr. Ballenger's assessment. (Tr. 1321).

On March 20, 2019, K.A.R. was seen by Dr. Ballenger and Vidya Sivaraman, M.D. (Tr. 1354). K.A.R. rated her pain as seven out of ten over the past week. (Tr. 1357). Dr. Ballenger indicated K.A.R. continued to have episodes of rash without a known trigger. (Tr. 1343). She had a two-week flare of rash without a known triggering event, such as allergen exposure, new medication, or cold exposure. (Tr. 1344). Frequent doses of Benadryl did not resolve the rash. (*Id.*). On exam, K.A.R. exhibited hypermobility and flat feet, but no other signs suggesting autoimmune disease, such as joint effusions or limitation in her range of motion. (Tr. 1343). Dr. Ballenger referred K.A.R. to the allergy clinic for evaluation of possible allergic triggers for her rash. (*Id.*). K.A.R. may also require a skin biopsy before considering additional immunosuppressive therapy. (*Id.*). On June 26, 2019, Dr. Ballenger noted that lab workups have been "reassuring against systemic autoimmune disease causing [K.A.R.'s] rash symptoms" and recommended a skin biopsy during the next flare-up to evaluate for urticarial vasculitis. (Tr. 1397, 1408-09).

On June 26, 2019, K.A.R. was evaluated by Mitchell Grayson, M.D., an allergist. (Tr. 1369). Dr. Grayson indicated K.A.R.'s history of rash was most consistent with urticarial vasculitis. (Tr. 1372). Dr. Grayson recommended avoiding medications including amoxicillin, cefdinir,

10

azithromycin, and gentamycin. (Tr. 1373). He also recommended avoiding tree nuts until confirmation of allergy via bloodwork analysis. (*Id.*). Dr. Grayson referred K.A.R. to dermatology; her first visit was on October 1, 2019 and confirmed urticaria and keratosis pilaris rubra. (Tr. 1414-36).

On follow-up on December 11, 2019, Dr. Grayson indicated K.A.R. had no increased reaction after an amoxicillin challenge and could receive penicillin/amoxicillin if necessary. (Tr. 1444). There was also no evidence of a food allergy after lab evaluation. (Tr. 1445).

**Physical Therapy.** K.A.R. started physical therapy on March 22, 2019. (*See, e.g.*, Tr. 1151). At her visit on April 3, 2019, Tim Hull, P.T.A., noted K.A.R. had poor motor control and had irritation with shoulder exercises. (*Id.*). K.A.R. reported pain at an eight out of ten after the last session, with pain at a three out of ten during the April 3 session. (*Id.*).

Physical therapy appointments on May 13, June 6, August 8 and August 15, 2019, indicate K.A.R. was experiencing increased pain and skin symptoms, limiting her ability to participate in physical therapy exercises. (Tr. 1109-12, 1123, 1133, 1139). K.A.R.'s physical therapist noted continued difficulty finding the right level of activity and exercise for K.A.R. (Tr. 1107, 1123). K.A.R. was unable to tolerate riding the recumbent bike for more than three minutes. (Tr. 1139). K.A.R. walked with a "significant limp" and decreased weight bearing on her right lower extremity and decreased step length on her left lower extremity. (*Id.*). Her therapist attempted aquatic therapies due to difficulty in progressing exercises during land therapies. (Tr. 1117, 1119). She suggested K.A.R. would benefit from 504 plan accommodations for gym class and extra time between classes if needed. (Tr. 1107).

On September 24, 2019, K.A.R. (now 11 years old) had a periodic physical therapy

assessment. (Tr. 1099-1102). Renee Dubler, P.T., stated:

> seeing [K.A.R.'s] response to PT sessions, it has become evident that [K.A.R.] has
> some form of an autoimmune disease (most recent possible dx is urticarial vasculitis)
> and symptoms of other allergies that interact and can exacerbate each other on a
> seasonal basis. The multiple medical issues that affect her pain along with [K.A.R.'s]
> shy, timid, eager to please personality has made it difficult to make consistent
> progress.

(Tr. 1100). Her physical therapist recommended continued physical therapy once weekly for an

additional six months. (Tr. 1101). PT Dubler also recommended continued gentle, consistent

strengthening activities at home, even on "bad" days, will improve K.A.R.'s pain overall more than

complete rest, due to muscle weakness. (Tr. 1100).

Physical therapy progress notes from September 2019 indicate K.A.R. is fearful of falling

when she walks up and down stairs at school, due to her slowness compared to her peers. (Tr.

1086). K.A.R. experienced increased pain for a month after starting school in the fall. (*Id.*). K.A.R.

has pain when squatting and stepping on 3" – 6" steps; she can pick up objects from the floor if

she bends at the waist instead of squatting. (*Id.*).

On October 1, 2019, K.A.R. had improved in performing lateral leg lifts. (Tr. 1097).

Despite improvement, her physical therapist noted K.A.R. needs written recommendations for

physical education accommodations at school. (*Id.*). On October 15, 2019, her physical therapist

indicated she wrote a letter to K.A.R.'s school excusing K.A.R. from physical education. (Tr.

1093).

Notes from October 29, 2019 indicate it is "very difficult" to improve K.A.R.'s strength

without flaring up her pain. (Tr. 1091). Notes from November 19, 2019 indicate that K.A.R.

exhibited good effort. (Tr. 1089). However, her physical therapist continued to have difficulty challenging K.A.R. enough to gain strength without significantly increasing her pain. (*Id.*).

K.A.R. attended physical therapy on December 3, 2019. (Tr. 1085). Her physical therapist noted K.A.R. "breathes with a shallow upper chest pattern with shoulders elevated and protracted frequently seen in chronic pain patients" and added belly breathing to her plan. (*Id.*).

Physical therapy appointments on December 10 and 28, 2019, indicate K.A.R. put forth good effort, despite pain and fatigue. (Tr. 1661-64).

**Emergency Department.** On April 16, 2018, K.A.R. presented to Akron Children's Hospital with pneumonia after a worsening cold. (Tr. 765-66). She presented with fatigue, fever, congestion, rhinorrhea, sore throat, cough, difficulty breathing, and abdominal pain. (Tr. 766). A medical update from her attorney indicates K.A.R. was treated for pneumonia, a collapsed lung, fever, and dehydration. (Tr. 770). She was prescribed an antibiotic to take over a ten-day course. (Tr. 765). K.A.R. had an urticaria outbreak during this pneumonia episode. (Tr. 777). K.A.R. was then treated at Nationwide Children's Hospital and observed for signs of sepsis. (Tr. 1212-57). She improved after being treated for dehydration and a UTI; she was able to dance in the hallway upon discharge. (Tr. 1237).

K.A.R. has frequent illnesses, and is often seen in the emergency department for problems such as UTI, sore throat (Tr. 796-835), pinkeye, (Tr. 836-38), abdominal pain (Tr. 856-77), increased rashes (Tr. 884), cough, flulike symptoms with elevated heart rate and troubled breathing. (Tr. 1052-66).

IV.    MEDICAL OPINIONS

**State Agency Reviewers.** State agency medical consultants reviewed K.A.R.'s record at the initial and reconsideration levels. (Tr. 75-89, 91-105). On December 5, 2017, Obiaghanawa Ugbana, M.D., and Courtney Zeune, Psy.D., opined that K.A.R.'s impairments were severe, but did not meet, medically equal, or functionally equal the listings based on example. (Tr. 83-85). The medical consultants considered Listings 112.04 (depressive, bipolar, and related disorders), 112.06 (anxiety and obsessive-compulsive disorders), and 114.09 (inflammatory arthritis). (Tr. 83-84). The medical consultants opined that K.A.R. had less than marked limitation in the domains of Acquiring and Using Information, Interacting and Relating with Others, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being, and no limitation in Attending and Completing Tasks. (Tr. 84-85). K.A.R. was therefore determined not disabled at the initial level. (Tr. 87).

The initial findings were affirmed on reconsideration by Robert Baker, Ph.D., and Louis Goorey, M.D., in May 2018. (Tr. 99-101). Drs. Baker and Goorey modified the determination at the initial level and evaluated K.A.R. with less than marked limitation in the domain of Attending and Completing Tasks and no limitation in Caring for Yourself. (Tr. 100-01).

**Dr. Paulus.** On November 20, 2017, K.A.R. (then 9 years old) underwent a psychological evaluation with John Paulus, Ph.D., at Swearingen and Associates. (Tr. 730-35). In Dr. Paulus's assessment, K.A.R. is impaired relative to typically-developing children of the same age, in multiple areas: acquiring and using information; attending to and completing tasks; and interacting and relating with others. (Tr. 734-35). In summarizing his reasoning, Dr. Paulus explained: "[K.A.R.] is nervous, avoidant and internalizes her worries and anxiety. She is fearful of socializing with peers .

14

. . . Her nervous, hypomanic mood hampers concentration and school work pace. She struggles with juvenile arthritis and an autoimmune disorder. [K.A.R.] is impaired in following directions, concentration, interpersonal functioning, and stress tolerance." (Tr. 735).

Dr. Paulus noted K.A.R. was in the third grade and had done well in school that year. (Tr. 731). K.A.R. was enrolled in special learning and emotional classes, beginning in kindergarten. (*Id.*). K.A.R. gets along well with peers and teachers, but has trouble making and keeping friends; according to Ms. Smart, K.A.R. has social anxiety. (*Id.*). Dr. Paulus noted no behavioral or attendance issues, or issues with authority figures. (*Id.*). K.A.R. was receiving outpatient therapy and had never been prescribed psychiatric medications. (Tr. 732). Dr. Paulus indicated K.A.R. experiences depression when she cannot keep up physically with other children her same age. (Tr. 733). K.A.R. experiences mood swings ranging from anxiety and nervousness to depression. (*Id.*). Dr. Paulus observed K.A.R. exhibiting anxious behaviors, including fidgeting and crying. (*Id.*).

As to K.A.R.'s medical history, Dr. Paulus noted current juvenile arthritis and an autoimmune disease, with current medications including meloxicam, folic acid, Prevacid, Zyrtec, Singulair, amitriptyline, methotrexate, Benadryl, and Tylenol. (Tr. 731). Dr. Paulus noted impaired fine motor skills. (Tr. 732). K.A.R. was able to help her mother with chores, but could not tie her own shoes or wake up on her own. (*Id.*).

Dr. Paulus assessed K.A.R. with poor abstract reasoning, because she could not interpret any of the three proverbs presented. (Tr. 733). K.A.R.'s concentration, persistence, and pace of task were good. (*Id.*). K.A.R. demonstrated below average recall skills in both forward and backward recall tasks. (*Id.*). K.A.R. could add and subtract correctly, but could not multiply correctly. (*Id.*).

## V.    OTHER RELEVANT EVIDENCE

**School Records.** K.A.R. has had numerous school absences due to illness or doctor visits. (Tr. 1494-98). Her IEP indicates that K.A.R.'s medical issues affect her education due to pain. (Tr. 1502). K.A.R.'s physical therapist recommended extended time to walk up the stairs, walking laps instead of running during physical education, and watching the weight in her backpack. (*Id.*). Her IEP also indicates a risk for falls; K.A.R. received an accommodation to be excused early with a peer to help her walk up/down stairs. (Tr. 1505). K.A.R. also received an extra set of books for home use so she does not have to carry books. (*Id.*).

An assessment of K.A.R.'s fine motor skills on February 14, 2018, indicate she has painful joints resulting in decreased endurance for fine motor tasks. (Tr. 1530, 1536). K.A.R. uses self-opening scissors and a thick pencil with gripper to properly position her joints. (*Id.*). Even with these accommodations, K.A.R. reported fatigue after writing 3-4 sentence paragraphs. (*Id.*). K.A.R. was provided accommodations to perform keyboarding work rather than written work for class assignments; K.A.R. could type five words per minute with ninety percent accuracy. (Tr. 1530-31). Specialized instruction from occupational therapy was discontinued on February 17, 2017, because K.A.R. could make progress in fine motor skills without aid from occupational therapy. (Tr. 1531, 1536).

K.A.R.'s fifth grade teachers completed a teacher questionnaire dated January 14, 2020. (Tr. 360-67). The form indicated K.A.R. receives 160 minutes of special education services daily in the areas of reading, math, and written language. (Tr. 360). K.A.R. has "an obvious problem" in demonstrating strength, coordination, and dexterity in activities or tasks, and "a slight problem" in all other assessed areas of Moving about and Manipulating Objects, save for showing a sense of

16

body's location and movement in space. (Tr. 364). K.A.R. experiences frequent headaches, UTI's, chronic disease, juvenile arthritis, hypermobility arthralgia syndrome, and autoimmune disorder; she receives physical therapy for her hands and joints and counseling for depression and anxiety. (Tr. 366).

K.A.R.'s fifth grade teachers also completed a functional questionnaire. (Tr. 1650-56). The team indicated that K.A.R. has some moderate difficulties when acquiring and using information, but is "fine" once she learns the material. (Tr. 1651). K.A.R. can be shy in a large group, but is considerate of others, respectful, and kind. (Tr. 1652). K.A.R. is focused and driven and has no difficulties attending and completing tasks (although the team indicated moderate difficulties in keeping pace with other children). (Tr. 1653). K.A.R. exhibits good self-care, except she does become stressed at times when she thinks she may fall behind in school. (Tr. 1654). K.A.R. has moderate difficulties in all areas regarding moving about and manipulating objects, including fine and gross motor skills. (Tr. 1655). The school nurse indicated K.A.R. had visited the clinic seven times that school year for complaints of itching and stomach issues. (Tr. 1656).

**Function Report.** Ms. Smart completed a function report on August 16, 2017. (Tr. 194-203). In it, Ms. Smart relates K.A.R. has difficulty remembering things she has been told, and that her first grade teacher noted K.A.R. has a delay and cannot respond quickly to answers in class. (Tr. 197). Ms. Smart noted K.A.R. has problems with pain, swelling, and stiffness due to her juvenile arthritis, limiting her ability to run or jump. (Tr. 199). K.A.R. has an accommodation in her IEP to use special scissors. (*Id.*). K.A.R. experiences social anxiety due to her health problems and weight; she sees a counselor at Children's Hospital and at school. (Tr. 200). Ms. Smart described K.A.R.'s physical and mental impairments limit her ability to button clothes by herself,

get to school on time, and accept criticism. (Tr. 201). In addition, K.A.R. has stomach issues, pain, aches, and swelling, depression and anxiety, she tested positive for ANAs/lupus, urticaria, and has been admitted to the hospital for sepsis, pneumonia, and has required breathing tubes. (Tr. 202).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

18

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### THE ALJ'S DECISION

The ALJ's decision, dated March 11, 2020, included the following findings of fact and conclusions of law:

1. The claimant was born on August 13, 2008. Therefore, she was a school-age child on June 16, 2017, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since June 16, 2017, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: inflammatory arthritis; hypermobility arthralgia; pes planus-bilateral; uticaria [*sic*]; obesity, anxiety and depression (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.    The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since June 16, 2017, the date the application was filed (20 CFR 416.924(a)).

(Tr. 16-30).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1.    Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.    Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.    Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). These are: (1) acquiring and using information; (2) attending and completing tasks: (3) interacting and relating with others, (4) moving about and manipulating objects: (5) caring for yourself; and (6) health and physical well-being. *Id.* If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

### DISCUSSION

Ms. Smart brings two challenges for review. First, she maintains that because former Commissioner Andrew Saul's appointment was unconstitutional, the "SSA's structure is also unconstitutional," thus rendering ALJ Wang's decision in K.A.R.'s case constitutionally defective. Second, she argues the ALJ's decision that K.A.R. did not meet, equal, or functionally equal a

Listing was not supported by substantial evidence. (Pl.'s Br., ECF #10, PageID 1721-22). I address each argument in turn.

## I. Ms. Smart's constitutional challenge fails.

Ms. Smart first contends that remand is required because former Commissioner Saul was appointed as the head of the Social Security Administration (SSA) in violation of the separation of powers. (*Id.* at PageID 1729-30). The Commissioner agrees the provisions limiting the President's removal authority in 42 U.S.C. § 902(a)(3), under which former Commissioner Saul was appointed, violate the separation of powers. (Comm'r's Br., ECF #12-1, PageID 1758). But, without more, Ms. Smart's constitutional challenge fails because she has not shown how a limitation on the President's ability to remove former Commissioner Saul caused her harm when ALJ Wang issued an unfavorable decision in her case.

As a threshold matter, I conclude Ms. Smart has not forfeited her ability to raise her constitutional challenge despite not first raising the issue during the administrative proceedings. (*See* Pl.'s Br., ECF #10, PageID 1730). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. However, this rule does not change Sixth Circuit precedent (*see Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537 (6th Cir. 2020)), nor does it change the claimant's requirement to raise the issue in the opening brief or else waive the claim. *Kathrine R. v. Kijakazi*, No. 2:19-CV-00334-FVS, 2021 WL 3854431, at *3-4 (E.D. Wash. Aug. 27, 2021) (finding that *Carr* did not change existing precedent that

claimant could have, but did not, raise an Appointments Clause claim in her opening brief, and thus declining to amend or alter judgment).

However, I note that Ms. Smart's Complaint in this Court does not include reference to any constitutional challenges. (ECF #1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint need not provide "detailed factual allegations," but at a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Ms. Smart grounds her constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to give notice of the claim when she filed her Complaint in January 2021. Accordingly, her constitutional claim—advanced for the first time in her Merits Brief (ECF #10)—is procedurally improper. *See, e.g., Butcher v. Comm'r of Soc. Sec.*, No. 2:20-CV-6081, 2021 WL 6033683, at *6 (S.D. Ohio Dec. 21, 2021), *report and recommendation adopted sub nom. Christina B. v. Comm'r of Soc. Sec.*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

Despite the defects in her Complaint, I proceed to the merits of Ms. Smart's constitutional claim. Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019,[5] pursuant to 42 U.S.C. § 902(a). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove

---

[5]     *See Social Security Administration, Executive Bios, Andrew Saul*, http://www.ssa.gov/ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited April 18, 2022).

the Commissioner as the head of an executive agency. (Pl.'s Br., ECF #10, PageID 1729; Comm'r's Br., ECF #12-1, PageID 1758). *See also Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2191 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect of duty, or malfeasance") violates the separation of powers and is unconstitutional); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law*, the Supreme Court held the provisions contained in 12 U.S.C. § 5491(c)(3) allowing the President to remove the Director of the Consumer Financial Protection Board (CFPB) only for "inefficiency, neglect of duty, or malfeasance of office," violated the separation of powers doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court also found that the unconstitutional removal provision was severable from the other provisions of the relevant statute, thereby maintaining the CFPB intact as an agency. *Id.* at 2208, 2211. The Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. The Court has since addressed this issue in *Collins v. Yellen*.

In *Collins*, the Court considered a similar statute governing the removal of Directors of the Federal Housing Finance Agency (FHFA). The majority held that "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a

result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

The *Collins* Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S. Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment") (citing *Seila Law*, 140 S. Ct. at 2207-11). Rather, "to obtain reversal of an agency decision, a plaintiff would need to demonstrate compensable harm flowing from the unconstitutional removal clause." *Id.* at 1788-89. Although "the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment," an unconstitutional statutory provision may yet inflict compensable harm entitling claimants to retrospective relief. *Id.* The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1789. Notably, each of these examples require the President to acknowledge being prevented from removing an agency head due to the unconstitutional statutory provision. Ms. Smart has made no such allegation in her constitutional argument, which is long on form but short on specifics.

In this case, the parties disagree as to the effect the unconstitutional removal restriction has on the ALJ's determination of Ms. Smart's disability application. Ms. Smart argues Commissioner

Saul's appointment violated the separation of powers, thereby depriving him of authority to carry out the functions of his office, including delegating authority to ALJ Wang or to the Appeals Council who determined her benefits claim and, therefore, she is entitled to remand for a *de novo* hearing. (Pl.'s Br., ECF #10, PageID 1730). The Commissioner disagrees, noting that the ALJ who adjudicated Ms. Smart's claim held office under an appointment legally ratified in July 2018 by then-Acting Commissioner Nancy Berryhill. (Comm'r's Br., ECF #12-1, PageID 1760). The Commissioner also asserts that Ms. Smart has not shown she was affected, much less harmed, by the unconstitutional removal restriction. (*Id.* at PageID 1762-65).

Acting Commissioner Berryhill—who ratified the appointment of ALJ Wang—was removable at-will and was therefore not subject to § 902(a)(3)'s removal provision. (*Id.* at PageID 1760-61). This is fatal to any constitutional claims of harm or entitlement to relief Ms. Smart may allege. *See Collins*, 141 S. Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections). Section 902(b) confirms there are no removal restrictions for an Acting Commissioner. Thus, there is no nexus between Acting Commissioner Berryhill's ratification of ALJ Wang's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Ms. Smart has not shown that Acting Director Berryhill or ALJ Wang lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3), or that she suffered harm as a result.

Even if former Commissioner Saul had appointed ALJ Wang, the unconstitutionality of the removal provision did not deprive former Commissioner Saul of the ability to delegate power

to others to decide the claim. The doctrine of severability applies where, as the Supreme Court explained in *Seila Law*, "one section of a statute may be repugnant to the Constitution without rendering the whole act void." 140 S. Ct. at 2208. *Seila Law* found the unconstitutional removal provision was severable from the remaining statute because the CFPB was capable of functioning independently even if the provision is stricken. *Id.* at 2209-10.

The same result obtains here, because "[i]f the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional." *Butcher,* 2021 WL 6033683, at *7 (citing *Alice A. v. Comm'r of Soc. Sec.*, No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding the plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration)). Moreover, Ms. Smart's argument that the former Commissioner did not have authority to carry out the functions of office because the removal restriction was unconstitutional was already rejected by the Supreme Court in *Collins*. *See* 141 S. Ct. at 1788. She must still show she suffered compensable harm flowing from the removal clause. *Id.* As discussed above, she has not shown such compensable harm.

For the foregoing reasons, I find Ms. Smart's separation of powers claim lacks merit. Accordingly, I do not reach the Commissioner's alternative arguments as to harmless error, de factor officer, the rule of necessity, and other prudential considerations. *See, e.g.*, *Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14,

2018); *see also Butcher*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.").

## II. Substantial evidence does not support the ALJ's decision on the merits of K.A.R.'s application.

Ms. Smart asserts in her brief that the ALJ's decision finding that K.A.R. did not meet or equal Listings 101.02 (major dysfunction of a joint), 114.09 (inflammatory arthritis), or 108.00 (urticaria) was not supported by substantial evidence.[6] (Pl.'s Br., ECF #10, PageID 1730-31). Ms. Smart next asserts the ALJ's decision that K.A.R. did not functionally equal a listed impairment was not supported by substantial evidence. (Pl.'s Br., ECF #10, PageID 1730-31, 1736-37). She argues the ALJ failed to consider relevant evidence, and instead extrapolated the evidence to find that K.A.R. had less than marked functional limitations. (*Id.* at 1736). She further asserts the ALJ did not follow the "whole child approach" described in SSR 09-1p or properly apply SSR 09-6p regarding moving about and manipulating objects when considering the interactions of K.A.R.'s multiple impairments and their effect on her functional abilities. (*Id.* at 1737).

---

[6] Although Listings 112.04 (depression), 112.06 (anxiety), and SSR 19-2 (obesity) were referenced in Ms. Smart's brief, they are perfunctory arguments and are deemed waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). I therefore discuss Ms. Smart's claim as I can best determine it is presented: an argument that the ALJ improperly analyzed Listing 101.02, 114.09, and 108.00, and that the ALJ's consideration of K.A.R.'s abilities in the six functional equivalence domains did not accord with SSRs 09-1p or 09-6p and is not supported by substantial evidence.

The Commissioner responds that the ALJ properly considered Listings 114.09 and 108.00,[7] rejects the evidence cited by Ms. Smart as either unreliable after diagnosis changes or downright misleading, and asserts the ALJ properly considered K.A.R.'s illnesses, her response to medication, and the effect of K.A.R.'s impairments on her functional abilities. (Comm'r's Br., ECF #12-1, PageID 1770-78).

I disagree with the Commissioner's argument against remand. It suffers from the same mischaracterizations of the record regarding K.A.R.'s diagnoses and their impact on her functional abilities found in the ALJ's decision, as discussed below.

**Listing 101.02.** The ALJ considered K.A.R.'s joint pain associated with her hypermobility arthralgia under Listing 101.02 (major dysfunction of a joint due to any cause). (Tr. 16-17). In pertinent part, Listing 101.02 as considered by the ALJ requires:

> major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis, with involvement of one major peripheral weight-bearing joint and resulting in inability to ambulate effectively.

(Tr. 16). The ALJ went on to describe examples of an "inability to ambulate effectively," including: "the inability to walk without two crutches or two canes . . . the inability to carry out age-appropriate school activities independently, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." (Tr. 17). Despite this description, the ALJ found that K.A.R.'s "conditions and related symptoms do not individually or in combination meet or medically equal the severity of Listing 101.02A, as there is no evidence documenting that she

---

[7]  The Commissioner asserts Ms. Smart has waived argument regarding any other Listings referenced. (Comm'r's Br., ECF #12-1, PageID 1770 n.8).

requires two canes or crutches for ambulation for a continuous period of at least 12 months since the application date." (Tr. 17).

The ALJ is correct in stating that K.A.R. does not require two canes or crutches to ambulate. The ALJ's decision also provides additional examples of an inability to carry out age-appropriate school activities independently and the inability to climb a few steps at a reasonable pace with the use of a single handrail, but omits any discussion of the evidence in the record showing K.A.R. has similar limitations to those described. (*See, e.g.*, Tr. 50-51, 1107, 1086, 1505). Such an omission denotes a decision not supported by substantial evidence. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724-25 (6th Cir. 2014) (collecting cases) (reversing the ALJ's decision where the reasoning showed that the ALJ "discounted the severity of [the claimant's] conditions . . . by failing to address certain portions of the record . . .").

**Listing 114.09.** The ALJ considered K.A.R.'s "inflammatory arthritis" under Listing 114.09 (inflammatory arthritis), and found that there was "no evidence of persistent inflammation or deformity of a major weight-bearing joint." (Tr. 17). There was no evidence of joint inflammation, to the extent that K.A.R.'s juvenile arthritis diagnosis was later modified to hypermobility arthralgia when her rheumatologist found no signs of arthritis on examination. (*See, e.g.*, Tr. 1325, 1333). However, I disagree with the ALJ's conclusion to the extent that K.A.R.'s joint pain and rash are not otherwise found in a different Listing and might nonetheless best be evaluated under this Listing.

As noted in § 114.00(D)(6):

The spectrum of inflammatory arthritis includes a vast array of disorders that differ in cause, course, and outcome. Clinically, inflammation of major joints in an upper or a lower extremity may be the dominant manifestation causing difficulties with walking or fine and gross movements; there may be joint pain, swelling, and

30

tenderness. The arthritis may affect other joints, or cause less limitation in walking or fine and gross movements. However, in combination with extra-articular features, including constitutional symptoms or signs (severe fatigue, fever, malaise and involuntary weight loss), inflammatory arthritis may result in an extreme limitation.

Therefore, to the extent K.A.R.'s current diagnoses may be included in the "vast array of disorders" within the spectrum of inflammatory arthritis, the ALJ's minimal analysis and failure to discuss the medical evidence significantly limits my ability to conduct a meaningful review.

The ALJ's assertion that there is "no evidence" of joint deformity, an inability to ambulate effectively, inability to perform gross or fine movements effectively, or involvement of two or more organs with at least two constitutional signs (Tr. 17) is belied by a review of the record. I note, for example, that hypermobility arthralgia is a disorder affecting the ligaments in a person's joints (*see* n.2, *supra*), urticarial vasculitis affects both the cardiovascular system and the skin (*see* n.3, *supra*), and the record (as summarized above) is replete with K.A.R.'s complaints of both fatigue and malaise. The ALJ's failure to analyze the record evidence prevents my meaningful review and I am unable to determine if the ALJ considered these issues.

**Listings Within 108.00.** When evaluating Listings related to skin disorders, the ALJ states, in whole: "The undersigned considered the claimant's uticaria [*sic*] with respect to the listings within section 108.00 (skin disorders). The evidence does not satisfy the criteria of any of the applicable listings." (Tr. 17). When evaluating whether a claimant's impairment meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant Listing], and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Without more, I am unable to conduct a meaningful review of the ALJ's decision as to whether K.R.A's skin disorder might meet a Listing within 108.00.

31

In closing this portion of my Listings analysis, I note also that K.A.R's diagnoses have changed over time, particularly with respect as to whether she has an autoimmune disorder, and if so, which diagnosis best fits her symptoms of joint pain and rash. The record contains diagnoses changing over time that include lupus (*see* Tr. 1530), juvenile arthritis (*see, e.g.*, Tr. 597), and hypermobility arthralgia, mechanical in nature, while her rash was diagnosed as urticarial vasculitis. (*See, e.g.*, Tr. 1397). As K.A.R.'s diagnoses change, the Listings analysis may also change. I therefore further recommend on remand that the ALJ consider any pertinent Listing that may appropriately reflect K.A.R.'s diagnosis at that time.

**Functionally Equaling a Listed Impairment.** Ms. Smart also asserts the ALJ erred in evaluating the functional domains and should have considered K.A.R.'s impairments as a whole, in combination with multiple body systems and symptoms. (Pl.'s Br., ECF #10, PageID 1735-40). She argues the ALJ misstated Dr. Paulus's medical opinion, disregarded evidence, and did not consider K.A.R.'s actual functional abilities. (*Id.*).

To support a Step Three determination that a child claimant functionally equals a Listing, the ALJ must find that the impairment is "of listing-level severity," and must either "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). As noted above, the six domains of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Under the SSA's regulations, this evaluation will include asking "for information from [the child's] parents and teachers, and . . . from others who

32

see [the child] often and can describe [the child's] functioning at home, in childcare, at school, and in [the] community." 20 C.F.R. § 416.926a(b)(3).

When determining functional equivalence, the SSA's rules provide that the functional equivalence evaluation starts by considering the child's functioning—it looks "first at [the claimant's] activities and limitations and restrictions." 20 C.F.R. § 416.926a(c); *see also* SSR 09-1p. Regulations also provide that the ALJ considers the information in the claimant's case record about how the claimant's functioning is affected during all of the claimant's activities, *i.e.*, everything the claimant does at home, at school, and in the community. *Id.* at § 416.926a(b). This technique is called the "whole child" approach, and is intended to "account[] for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings." SSR 09-1p. The technique further requires the ALJ to "consider how the child functions every day and in all settings compared to other children the same age who do not have impairments."

Specific to the functional equivalence domain of "moving about and manipulating objects," SSR 09-6p explains that ALJs are to "consider the physical ability to move one's body from one place to another, and to move and manipulate things. These activities may require gross or fine motor skills, or a combination of both." *Id.* Both physical and mental impairments may affect a child's ability in this domain; for example, a child with rheumatoid arthritis may have difficulty writing. *Id.* School age-children (age 6 to attainment of age 12) should be able to:

- Use[] developing gross motor skills to move at an efficient pace at home, at school, and in the neighborhood.

- Use[] increasing strength and coordination to participate in a variety of physical activities (for example, running, jumping, and throwing, kicking, catching and hitting balls).

- Appl[y] developing fine motor skills to use many kitchen and household tools independently (for example, scissors).

- Write[] with a pen or pencil.

*Id.*

Here, when applying the whole child approach and evaluating K.A.R.'s functional abilities in the six domains, the ALJ found K.A.R.'s impairments did not functionally equal the severity of the listings. (Tr. 18-29). However, the evidence cited by the ALJ significantly mischaracterizes the medical record and cannot serve as substantial evidence to support his findings.

In support of his findings, the ALJ describes the records in part as follows:

- **The record is significant for the claimant's history of arthralgia and uticaria. Treatment notes reflect the claimant's complaints of knee, shin and foot pain worse in the evening and occasional episodes of knee and finger swelling. Physical examinations generally show no joint swelling or limitation of motion. Her symptoms were responsive to methotrexates and during periods when she missed doses of her medication, she did not have breakthrough symptoms. Accordingly, she was ultimately weaned off the medication.** (Tr. 20).

Looking to the period when K.A.R. was "weaned off" of methotrexate, Dr. Ballenger's notes indicate K.A.R. had "missed many doses of methotrexate over the past six months for frequent viral symptoms." (Tr. 1322). K.A.R. had continued joint pain multiple times per week, despite no swelling in her knee or limitation in her range of motion. (Tr. 1322, 1325). K.A.R. continued to take Mobic for her joint pain. (Tr. 1322). At times, she rated her joint pain as high as seven on a ten-point scale. (Tr. 1357). K.A.R. also had urticaria outbreaks lasting for weeks, despite no known trigger, after she stopped taking the methotrexate. (Tr. 1344).

- **Her ongoing intermittent lower extremity pain was assessed as mechanical in nature and related to hypermobility and flat feet as upon rheumatologic follow-up she did not exhibits signs of arthritis. She was recommended to participate in physical therapy to help with strengthening and to use shoe**

34

**inserts to help with positioning. The claimant engaged in physical therapy making progress in all goals.** (Tr. 20).

The ALJ's assessment that K.A.R. was able to "progress in all goals" is not supported by my reading of the physical therapy notes. Rather, the notes state as follows:

> seeing [K.A.R.'s] response to PT sessions, it has become evident that [K.A.R.] has some form of an autoimmune disease (most recent possible dx is urticarial vasculitis) and symptoms of other allergies that interact and can exacerbate each other on a seasonal basis. The multiple medical issues that affect her pain along with [K.A.R.'s] shy, timid, eager to please personality has made it difficult to make consistent progress.

(Tr. 1100). There are also numerous references to K.A.R.'s pain and inability to complete physical therapy activities during the 30-minute sessions. K.A.R.'s physical therapist had difficulty finding the right level of activity and exercises that would not exacerbate K.A.R's pain. (Tr. 1107, 1123). K.A.R. could not tolerate riding the incumbent bike for more than three minutes. (Tr. 1139). Her therapist attempted aquatic therapies due to difficulty in progressing with exercises during land therapies. (Tr. 1117, 1119). The only goal K.A.R. was able to fully achieve during physical therapy was independence with her home exercise program. (*See* Tr. 1663).

- **The undersigned considered the psychological consultative examiner's report at Exhibit 9F. The consultant's clinical findings are generally consistent with the overall record and while he offers only vague limitations with respect to the claimant's functional abilities, to the extent they support such limitations can be interpreted as indicating less than marked limitation in all functional domains, the undersigned finds the report persuasive.** (Tr. 22).

In Dr. Paulus's assessment, K.A.R. is "impaired" relative to typically-developing children of the same age, in multiple areas: acquiring and using information; attending to and completing tasks; and interacting and relating with others. (Tr. 734-35). He did not provide further indication of the level of severity of K.A.R.'s impairments (*See id.*).

35

I further note that when summarizing his reasoning, Dr. Paulus explained that K.A.R. "is

nervous, avoidant and internalizes her worries and anxiety. She is fearful of socializing with peers .

. . . Her nervous, hypomanic mood hampers concentration and school work pace. She struggles

with juvenile arthritis and an autoimmune disorder. [She] is impaired in following directions,

concentration, interpersonal functioning, and stress tolerance." (Tr. 735). Dr. Paulus assessed

K.A.R. with poor abstract reasoning, because she could not interpret any of the three proverbs

presented. (Tr. 733).

- **The claimant has a history of musculoskeletal pain. She testified that she
  can run for two to three minutes before her knees burn and she has some
  trouble with hand pain and numbness when writing and cutting. She stated
  that she has trouble climbing stairs but she holds on the railing or climbs
  one step at a time. In earlier grades, the claimant received occupational
  therapy for deficits in fine motor skills, endurance and strength. She
  exhibited functional gross motor skills, but some difficulty with fatigue and
  general weakness. The claimant has engaged in physical therapy and made
  improvement toward all of her goals. The claimant's teachers have noted
  some difficulty with fine and gross motor skills, as well as coordination.
  Specialized occupational therapy through school was discontinued and
  while the claimant continues to fatigue easily, no specific services have been
  recommended aside from access to adaptive writing and cutting tools and
  practice typing on a keyboard.** (Tr. 27).

In contrast with the ALJ's assertion, K.A.R. receives additional services not indicated by the

ALJ in the statement that "no specific services have been recommended aside from access to

adaptive writing and cutting tools and practice typing on a keyboard." (*Id.*). K.A.R.'s IEP indicates

that her medical issues affect her education due to pain. (Tr. 1502). K.A.R.'s physical therapist

recommended extended time to walk up the stairs, walking laps instead of running during physical

education, and watching the weight in her backpack. (*Id.*). Her IEP also indicates a risk for falls;

K.A.R. received an accommodation to be excused early with a peer to help her walk up/down

stairs. (Tr. 1505). K.A.R. also received an extra set of books for home use so she does not have to

carry books. (*Id.*). K.A.R.'s physical therapist indicated she wrote a letter to K.A.R.'s school

excusing her from physical education in October 2019. (Tr. 1093).

> • **As noted above, the claimant's history is significant for musculoskeletal pain, uticaria [sic] and obesity. However, the record indicates her symptoms generally have been managed though medication and physical therapy . . . The claimant has had periods of frequent acute illnesses and infection that were responsive treatment and eventually resolved. The record does not document the need for surgery or ongoing invasive treatment or therapies.** (Tr. 29).

The ALJ's assertion that K.A.R.'s "symptoms generally have been managed through

medication and physical therapy" is not borne out in my review of the record. Rather, the review

of the (extensive) medical record in K.A.R.'s case discloses a child who has had varying diagnoses

and medications with mixed therapeutic results. As discussed above, K.A.R.'s symptoms have not

been managed through physical therapy and she is limited in her ability to progress due to pain. It

is not clear that K.A.R. was weaned from methotrexate, or if she became too ill from constant

serious infections to continue taking this immunosuppressant. It is further concerning that the

ALJ would characterize K.A.R.'s frequent hospitalization for pneumonia, sepsis, or UTIs as simply

"frequent acute illnesses and infection that were responsive [to] treatment and eventually

resolved." Furthermore, while the record does not currently document the need for surgery or

invasive treatments, K.A.R.'s doctors have indicated the need for a skin biopsy to definitively

determine a possible cause for her chronic urticarial vasculitis flare-ups, indicating an as-yet-

unresolved illness.

For all of these reasons, I find that the ALJ's decision is not supported by substantial

evidence and requires remand, and therefore recommend the District Court reverse the

Commissioner's decision. On remand, I recommend that the ALJ provide a full and accurate

37

explanation of the evidence forming the basis for the ALJ's findings regarding: (1) whether the elements of Listings 101.02, 114.09, or those within 118.00 have been met; (2) analyze for any additional Listings that may be appropriate in light of K.A.R's diagnoses and symptoms; and (3) the level of limitation in each of the six functional categories required to functionally equal a Listing under 20 C.F.R. § 416.926a.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying SSI and **REMAND** this matter for proceedings consistent with the foregoing.

Dated: April 19, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the

arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).